UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Cr. No. 09-10175-MLW |
| | ) | |
| ARYAM GONZALEZ, | ) | |
| Defendant. | ) | |

<u>MEMORANDUM AND ORDER</u>

WOLF, D.J.                                                    June 30, 2010

I.   SUMMARY

This is another case in which police misconduct has jeopardized the prosecution of a defendant charged with unlawfully possessing a firearm, among other things.  See <u>United States v. Rullo</u>, 748 F. Supp. 36 (D. Mass. 1990) (Wolf, J.) (police officers beat suspect and testified falsely, resulting in suppression of firearm); <u>see also</u> <u>United States v. Jones</u>, 620 F. Supp. 2d 163 (D. Mass. 2009) (Wolf, J.) (police officers testified falsely but firearm not suppressed).  Defendant Aryam Gonzalez is charged with being a felon in possession of two firearms and possession of crack cocaine with intent to distribute it.  If convicted, he will be subject to a 15-year mandatory minimum sentence.  The guns and drugs involved in this case were found during the execution of a search warrant of the home of Gonzalez's mother in which he lived.

Gonzalez filed a motion to suppress.  The court heard three days of testimony.  For the reasons described in this Memorandum, the Motion to Suppress is meritorious with regard to all of the

evidence at issue except perhaps the second gun that was found under the mattress of Gonzalez's bed.  The parties have not addressed the discrete issues relating to the second gun and are being ordered to do so.

In summary, the Motion to Suppress is being allowed, at least in part, because the government has not proven that the incriminating statements Gonzalez made in leading the police officers to what he identified as his bedroom and showing them a shoebox containing the evidence at issue, except for the second gun, were made voluntarily and with an understanding of his Fifth Amendment rights as required by Miranda v. Arizona, 384 U.S. 436 (1996), and its progeny.  Contributing to this conclusion is the fact that, while Gonzalez was dazed and bleeding from a struggle with the police before being handcuffed, he was quickly administered Miranda warnings, which he did not understand, by Fall River Detective James Smith on the sidewalk outside his mother's home.  A few minutes later, while Gonzalez was still dazed and bleeding, Smith punched him in the stomach before reading him Miranda warnings in the house.  It is not proven that Gonzalez then understood his Miranda rights.  Additional circumstances, including a fear that other officers were preparing to beat him and unnecessarily trash his mother's home in the search, indicate that Gonzalez was coerced into making incriminating statements and giving the officers the shoebox containing one of the guns and the

crack cocaine that Gonzalez is charged with unlawfully possessing.

Because the government has not proven that Gonzalez waived his Fifth Amendment rights knowingly or voluntarily, both his statements and the physical evidence derived from them must be suppressed. See United States v. Patane, 542 U.S. 630, 639 (2004); Chavez v. Martinez, 538 U.S. 760, 769 (2003).  The inevitable discovery exception to the exclusionary rule does not qualify this conclusion.  Permitting the contents of the shoebox to be used as evidence would significantly weaken the protections provided by the Fifth Amendment.  See United States v. Almeida, 434 F.3d 25, 28 (1st Cir. 2006); Rullo, 748 F. Supp. at 40-45.  It would also abet police misconduct, which in this case involved not only Smith punitively punching Gonzalez, but Smith testifying falsely about events at Gonzalez's home as well. See Almeida, 434 F.3d at 28; Rullo, 748 F. Supp. at 40-45.

It is not clear whether the suppression of the gun and crack found in the shoebox will result in Gonzalez escaping conviction because the court may find that the second gun found in a search of Gonzalez's bedroom after he disclosed the shoebox is admissible. However, even if all of the evidence is suppressed and the case dismissed, the cost to society of condoning the police misconduct in this case would be unacceptable.  As Justice Louis D. Brandeis explained, in words that are etched into this courthouse:

> Our government is the potent, the omnipresent teacher.
> For good or for ill, it teaches the whole people by its

example.  Crime is contagious.  If the government becomes
a lawbreaker, it breeds contempt for law; it invites
every man to become a law unto himself; it invites
anarchy.

Olmstead v. United States, 277 U.S. 438, 485 (1928) (Brandeis, J.,

dissenting).


II.  STANDARDS

A.  Miranda Rights

The Fifth Amendment provides that "[n]o person...shall be

compelled in any criminal case to be a witness against himself."

To make this right meaningful, the Supreme Court has held that,

prior to a custodial interrogation, law enforcement officials must

inform the individual to be interrogated that: (1) he has the right

to remain silent; (2) his statements may be used against him at

trial; (3) he has a right to an attorney during questioning; and

(4) if he cannot afford an attorney, one will be appointed to

represent him.  See Miranda, 384 U.S. at 479; see also Dickerson v.

United States, 530 U.S. 428, 438-440 (2000).  An individual may

knowingly, intelligently and voluntarily waive these rights and

answer questions without an attorney.  See Miranda, 384 U.S. at

479; see also Berghuis v. Thompkins, No. 08-1470, 2010 WL 2160784,

at *11 (U.S. June 1, 2010).  However, unless the government

demonstrates that the required warnings have been given and have

been knowingly, intelligently and voluntarily waived, its use of

any statements obtained and, in some circumstances, evidence

4

derived from those statements, is curtailed.  <u>See</u> <u>Patane</u>, 542 U.S. at 644; <u>Miranda</u>, 384 U.S. at 444.

"The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." <u>Miranda</u>, 384 U.S. at 476.  Therefore, it is not sufficient for the government to show merely that a law enforcement officer read a person his <u>Miranda</u> rights.  <u>See</u> <u>Berghuis</u>, 2010 WL 2160784, at *11. Rather, the government must show that the person understands those rights, and voluntarily and intelligently relinquishes them.  <u>See</u> <u>id.</u>; <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).

As the Supreme Court has explained, the inquiry concerning whether <u>Miranda</u> rights have been waived "voluntarily, knowingly and intelligently...has two distinct dimensions."  <u>Moran</u>, 475 U.S. at 421.

> First, the relinquishment of the right must have been
> voluntary in the sense that it was the product of a free
> and deliberate choice rather than intimidation, coercion,
> or deception.  Second, the waiver must have been made
> with a full awareness of both the nature of the right
> being abandoned and the consequences of the decision to
> abandon it.  Only if the "totality of the circumstances
> surrounding the interrogation" reveal both an uncoerced
> choice and the requisite level of comprehension may a
> court properly conclude that the <u>Miranda</u> rights have been
> waived.

<u>Id.</u>; <u>see also</u> <u>Berghuis</u>, 2010 WL 2160784, at *9; <u>United States v. Harty</u>, 476 F. Supp. 2d 17, 27 (D. Mass. 2007) ("A statement may...be voluntary and yet not be the product of a knowing and

intelligent waiver of a constitutional right.") (citing <u>Edwards v. Arizona</u>, 451 U.S. 477, 483-84 (1981)).

After the evidentiary hearing on the motion to suppress in this case, the Supreme Court reiterated and reaffirmed that "[i]f the State establishes that a <u>Miranda</u> warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate a valid waiver of <u>Miranda</u> rights. The prosecution must make the additional showing that the accused understood these rights." <u>Berghuis</u>, 2010 WL 2160784, at *11 (internal quotation and citation omitted).

The government bears the burden of proof concerning a motion to suppress statements that a defendant asserts were obtained in violation of his <u>Miranda</u> rights. <u>See</u> <u>Miranda</u>, 384 U.S. at 475; <u>see also</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986). The knowing, intelligent and voluntary waiver of those rights must be proven by a preponderance of the evidence. <u>See</u> <u>Connelly</u>, 479 U.S. at 168. The Supreme Court has characterized this as a "heavy burden." <u>Miranda</u>, 384 U.S. at 475; <u>see also</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979) ("[T]he prosecution's burden is great[.]"). In <u>Berghuis</u>, the Supreme Court clarified the nature of this burden. It noted that "the <u>Miranda</u> Court stated that 'a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.'" 2010 WL 2160784, at

*10. The Court explained that "[t]he main purpose of <u>Miranda</u> is to ensure that an accused is advised of <u>and</u> <u>understands</u> his right to remain silent and the right to counsel." <u>Id.</u> (emphasis added). The Court then repeated that in <u>Connelly</u> it had stated that the government's "'heavy burden' is not more than the burden to establish waiver by a preponderance of the evidence." <u>Id.</u> (quoting <u>Connelly</u>, 479 U.S. at 168). <u>Berghuis</u>, therefore, confirms the importance of the government proving by a preponderance of the evidence not only that <u>Miranda</u> warnings were given, but also that they were actually understood. As the First Circuit explained in interpreting the Supreme Court's earlier jurisprudence, which remains reliable after <u>Berghuis</u>:

> Merely asking the accused whether he understood his rights does not satisfy the duties of an interrogating officer or make any statement the accused might then make admissible. <u>Miranda</u> requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them.

<u>United States v. Porter</u>, 764 F.2d 1, 7 (1st Cir. 1985) (citation omitted).

If the government proves that a defendant was properly advised of his rights and actually understood them:

> The prosecution [] does not need to show that a waiver of <u>Miranda</u> rights was express. An "implicit waiver" of the "right to remain silent" is sufficient to admit a suspect's statements into evidence. <u>Butler</u> made clear that a waiver of <u>Miranda</u> rights may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver."

<u>Berghuis</u>, 2010 WL 2160784, at *10 (quoting <u>Butler</u>, 441 U.S. at 373,

376) (internal citations omitted).  However, as indicated earlier, the government must prove that any waiver, express or implied, was not only knowing but was also "'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.'"  Id. at *9 (quoting Moran, 475 U.S. at 421).

The adequacy of the Miranda warnings given in a particular case is relevant to both the question of whether a waiver was knowing and the question of whether a waiver was voluntary.  See Doody v. Schriro, 548 F.3d 847, 858 (9th Cir. 2008).  As explained in Doody, the "underlying purpose" of Miranda warnings is to "mitigate the inherent pressure in police interrogations."

> "In order to combat these pressures [inherent in a custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."

Id. at 862 (quoting Miranda, 384 U.S. at 467).  "[T]he protection actually provided in any given case [by the Miranda warnings] depends on how effective the warnings as given and implemented were in conveying their layered messages."  Id. (emphasis in original).

The question of whether Miranda rights have been knowingly and voluntarily waived "must be determined 'on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'"  Butler, 441 U.S. at 374-75 (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)); see also

8

United States v. Andrade, 135 F.3d 104, 107 (1st Cir. 1998).  "Only
if the totality of the circumstances surrounding the interrogation
reveals both an uncoerced choice and the requisite level of
comprehension may a court properly conclude that the Miranda rights
have been waived."  Moran, 475 U.S. at 421 (internal quotation and
citation omitted).

A range of factors have been considered in assessing the
totality of the circumstances surrounding an interrogation.  "Some
of the factors taken into account have included the youth of the
accused,...his lack of education..., or his low intelligence,...the
lack of any advice to the accused of his constitutional
rights,...the length of detention,...the repeated and prolonged
nature of the questioning,...and the use of physical punishment
such as the deprivation of food or sleep...."  Schneckloth v.
Bustamonte, 412 U.S. 218, 226 (1973) (citations omitted).  It is
also appropriate to consider "whether the defendant was properly
advised of his Miranda rights."  Doody, 548 F.3d at 859.  Other
relevant factors include "the manifest hostility of the police
toward [the suspect]; his age; his physical condition and emotional
state at the time of the confession; the proximity of the
confession to a violent arrest; his expressed fears that he would
be beaten by police; the inherent coerciveness of the [location of
the interrogation] as a setting for a confession; and the fact that
[the suspect] was struck by one of the officers...at the time he

made the incriminating statements." United States v. Brown, 557 F.2d 541, 548 (6th Cir. 1977).

A waiver of Miranda rights is not involuntary unless it involved coercion by the government because "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Connelly, 479 U.S. at 164. Therefore, "a defendant's mental state or condition, by itself and apart from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness.... Rather, the voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of police overreaching, not on free choice in any broader sense of the word." United States v. Rojas-Tapia, 446 F.3d 1, 7 (1st Cir. 2006) (internal quotations and citations omitted).

B.  The Exclusionary Rule

If the government does not prove that a defendant's waiver was knowing and also fails to prove that the waiver was voluntary, neither the defendant's statements nor any physical evidence derived from them may be used against him at trial. See Patane, 542 U.S. at 637, 644. As the Supreme Court has explained, "those subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal

trial." <u>Chavez</u>, 538 U.S. at 769 (emphasis in original); <u>see also</u> <u>Patane</u>, 542 U.S. at 640.

If the government fails to prove that a defendant's incriminating statements were made after a knowing waiver of understood <u>Miranda</u> rights but does establish that the statements were made voluntarily, the statements are excluded as evidence against the defendants in the government's case-in-chief. <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 307 (1985). However, such statements may be used on cross-examination to impeach the defendant. <u>See</u> <u>id.</u>; <u>United States v. Materas</u>, 483 F.3d 27, 32-33 (1st Cir. 2007). Moreover, if it is proven that the statements were made voluntarily, any physical evidence discovered as a result of those statements is not subject to suppression. <u>See</u> <u>Patane</u>, 542 U.S. at 642; <u>United States v. Jackson</u>, 544 F.3d 351, 361 (1st Cir. 2008) ("The Supreme Court has held that physical evidence need not be excluded simply because it is discovered as a result of unwarned questioning in violation of <u>Miranda</u>"); <u>Materas</u>, 483 F.3d at 32-33. In reaching this conclusion, the Supreme Court reasoned that:

> Introduction of the nontestimonial fruit of a voluntary statement . . . does not implicate the Self-Incrimination Clause. The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him.

<u>Patane</u>, 542 U.S. at 643.

In some cases, the inevitable discovery exception to the exclusionary rule permits the admission at trial of physical

evidence that would otherwise be excluded because of a constitutional violation.  See Nix v. Williams, 467 U.S. 431, 444 & n. 5 (1984).  In order to introduce evidence that would otherwise be excluded, the government must prove by a preponderance of the evidence: (1) that "the legal means by which the evidence would have been discovered was truly independent"; (2) that "the use of the legal means would have inevitably led to the discovery of the evidence"; and (3) that "applying the inevitable discovery rule would [not] either provide an incentive for police misconduct or significantly weaken constitutional protections."  Almeida, 434 F.3d at 28; see also United States v. Silvestri, 787 F.2d 736, 744 (1st Cir. 1986).  The third "inquiry is case-specific and requires an appreciation of the societal costs of the exclusionary rule."  Almeida, 434 F.3d at 28; see also United States v. Pardue, 385 F.3d 101, 108 (1st Cir. 2004); United States v. Scott, 270 F.3d 30, 45 (1st Cir. 2001).


III.  FINDINGS OF FACT

After hearing testimony on May 20, 21, and 24, 2010, the court has decided the facts, including issues of credibility, in the manner in which jurors are regularly instructed.  The court has not presumed that a police officer is more likely or less likely to tell the truth than any other witness.  See United States v. Pappas, 639 F.2d 1, 4 (1st Cir. 1980); Chavez v. United States, 258

F.2d 816, 819 (10th Cir. 1958).  With regard to all witnesses, the court has considered, among other things, whether: the witness seemed honest; the witness had a reason not to tell the truth; what the witness said was reasonable; the witness' testimony was corroborated or contradicted by other evidence; the witness had a good opportunity to observe the events at issue; and the witness had a good, independent memory.  The opportunity to observe the demeanor of the witnesses has been important to the court's decisions concerning credibility.

In general, the court has found Christopher Benitez to be the witness who gave the most accurate, complete, and credible account of events on February 13, 2009, although even his recollection was not accurate in every respect.  Smith did not provide a reliable account of several important matters.  With regard to at least one subject – the strip search of Benitez on February 13, 2009 and the strip searches of others previously – Smith knowingly testified falsely.  For the most part, the court has relied upon Gonzalez's testimony only to the extent that it was corroborated by other, credible evidence.

The court finds the following facts proven by a preponderance of the credible direct and circumstantial evidence.

February 13, 2009 was Gonzalez's twentieth birthday.  He had an eleventh grade education.  While not mentally impaired, Gonzalez was not an intelligent individual.

Gonzalez had prior encounters with the Fall River police, both as a juvenile and as an adult. During one of his two adult arrests, Gonzalez was roughed up in a hallway by about seven officers, resulting in a hairline fracture of his wrist. There is no direct evidence that Gonzalez received Miranda warnings when arrested previously. However, the court understands that it was the practice of Fall River officers to give Miranda warnings and infers that Gonzalez received them at least twice before February 13, 2009.

On February 13, 2009, Smith was a veteran member of the Fall River police and had served in the Vice Unit for about two years. As he testified, it was the Vice Unit's regular practice to wait until a suspect was present to execute a search warrant so an effort could be made to get him to make statements that would make it easier to find contraband and link the suspect to it, thus strengthening the case against him. Prior to February 13, 2009, Gonzalez never exercised his right to remain silent or to request a lawyer. In these circumstances, while the court infers that Gonzalez had been administered Miranda warnings previously, it has not been proven that he actually understood his rights prior to February 13, 2009.

Gonzalez's much more frequent contacts with the Fall River police were in the course of "Field Checks," which in some municipalities are called "Field Interrogation Observations," or

14

Field Intelligence Observations," both of which are known as "FIOs."  See, e.g., United States v. Jones, 609 F. Supp. 2d 113, 121 (D. Mass. 2009); Commonwealth v. Narcisse, 457 Mass. 1, 2 (May 27, 2010).  During a Field Check, or FIO, an officer stops an individual, often pat-frisks him, and interrogates him without delivering Miranda warnings because such stops are regarded by law enforcement officers as consensual encounters.  Therefore, in the great majority of his interactions with Fall River police, Gonzalez was not advised of his Fifth Amendment right to remain silent, but rather was led to believe that he was generally expected to submit to questioning and pat-frisks when approached by police officers.[1]

Smith has been accused on several occasions of being unnecessarily violent in the performance of his duties.  In addition, Smith apologized for hitting a diminutive woman outside a bar during an off-duty altercation.

On Friday, February 13, 2009, Smith and the other officers involved in Gonzalez's arrest were working the 10:00 a.m. to 6:00 p.m. shift.  On February 6, 2009, based on information concerning

---

[1]The Massachusetts Supreme Judicial Court recently scrutinized the constitutionality of FIOs that begin as "consensual encounters" but "escalate to the point of a search without being preceded by an analytically distinct stop." Narcisse, 457 Mass. at 8.  The Supreme Judicial Court concluded that under Massachusetts law, "police officers may not escalate a consensual encounter into a protective frisk absent a reasonable suspicion that an individual has committed, and is committing, or is about to commit a criminal offense and is armed and dangerous."  Id. at 9 (emphasis in original).

Gonzalez, Smith had obtained a warrant to search the home that
Gonzalez shared with his mother, step-father, and siblings.  This
warrant was required to be executed on or before February 13, 2009,
or it would expire.  Smith and Detective John Cabral had surveilled
the house for 20 to 30 minutes earlier that day, but did not then
execute the warrant because it appeared that there was no one in
the house and, as indicated earlier, it was the practice of members
of the Vice Unit to execute a search warrant while the suspect was
on the premises in the hope of getting him to make incriminating
statements.

At about 4:00 p.m., Smith and Cabral went back to the area of
Gonzalez's home and asked other officers to join them to execute
the warrant.  Before the other officers arrived, Smith and Cabral
observed what they believed to be a sale of drugs on the street,
close to Gonzalez's home.  Smith and Cabral got out of their
vehicle to arrest a man Smith recognized as Donald Singletary.
Upon being approached, Singletary shoved Smith and ran.  Smith and
Cabral pursued Singletary on foot for at least a block and a half.
Detective Bryan Nadeau joined the pursuit.  After Singletary was
knocked to the ground, Nadeau and Cabral subdued and handcuffed
him.  Smith characterized his own condition following Singletary's
arrest as "extremely out of breath" and "tired."  In addition, he
was concerned about whether the pursuit of Singletary would signal
the officers' presence and jeopardize their chances of finding

contraband in Gonzalez's home.  In general, Smith was exhausted and unhappy.

After Singletary's arrest, Smith and Nadeau returned in Nadeau's unmarked vehicle to the street on which Gonzalez lived to continue surveillance.  Cabral remained with Singletary.  About fifteen minutes after Singletary's arrest, Smith and Nadeau observed Gonzalez and Benitez exit Gonzalez's home, walking west along the street.  Smith and Nadeau got out of their vehicle and approached Gonzalez and Benitez from behind.  It is disputed whether the officers ordered them to stop.  In any event, Benitez stopped when he saw the officers and was handcuffed by Smith.

Gonzalez, however, did not stop.  He was tackled by Nadeau and fell face-down on the sidewalk.  Nadeau then jumped on Gonzalez and put his knee on his back.  Nadeau struggled with Gonzalez, but was unable to subdue him alone.  Nadeau believed, perhaps incorrectly, that Gonzalez was trying to swallow drugs.  Therefore, Nadeau squeezed Gonzalez's throat to prevent him from swallowing.  Cabral arrived, also put his knee on Gonzalez's back, and grabbed one of his arms.  After handcuffing Benitez, Smith too attempted to help get control of the still struggling Gonzalez.

It took about two minutes for the officers to subdue Gonzalez and handcuff him.  By the time they did, Gonzalez was bleeding slightly from an abrasion on his chin.  In addition, Gonzalez was then shocked and dazed.  He was not thinking clearly.

Smith testified that after Gonzalez was handcuffed, he read Gonzalez his <u>Miranda</u> rights.  While neither Benitez nor Gonzalez recall that this occurred, the court accepts that the rights were read to Gonzalez quickly on the sidewalk.  However, the court finds that Gonzalez – who was bleeding, recovering from having been choked during the two minute struggle, and dazed – did not say that he understood his rights.  In any event, it is not proven that Gonzalez actually understood his <u>Miranda</u> rights while on the sidewalk outside his home.

Gonzalez asked Smith if he had a warrant.  Smith responded that he did have "a fucking warrant."  Smith waved the search warrant in front of Gonzalez.  Gonzalez did not read it.

Smith took from Gonzalez's pocket a key to Gonzalez's home. Smith and Nadeau entered the home and did a quick, protective sweep of the premises.  Gonzalez and Benitez remained outside with Cabral.  A few minutes later, while Gonzalez was still dazed, he and Benitez were led by their upper arms into Gonzalez's home by Cabral.

Once Gonzalez and Benitez were inside, Smith instructed Cabral to close the door, stating that "[t]his is nobody's business." Gonzalez then said sarcastically to Smith,"[y]ou guys are really tough."  In response, Smith told Gonzalez to "shut the fuck up" and punched him in the stomach, causing Gonzalez to double over.  Smith promptly placed Gonzalez on the couch, with Benitez beside him.

Smith then read Gonzalez <u>Miranda</u> warnings and the search warrant.  Once again, Smith read the warnings quickly, in a way designed to minimize the risk that Gonzalez would exercise his <u>Miranda</u> rights.  He did not ask Gonzalez to read them or to sign a form stating that he understood them.  In any event, it is not proven that Gonzalez either acknowledged or actually understood the warnings.

Gonzalez and Benitez were on the couch.  Other officers, including Detective Sergeant John Martins and Detective Jay Huard, arrived and fanned out in the living room area.  Eventually, seven officers were present.

Smith asked Gonzalez and Benitez if they had any contraband to produce.  Gonzalez saw the officers putting on their gloves.  He thought that they were preparing to beat him and did not want their hands to touch the blood on his still bleeding chin.  Gonzalez also saw Smith grab his mother's large television as Cabral said to Gonzalez, "[j]ust show us where the stuff is so we don't have to go through this and start messing up everything in your house."

As a result of having been punched and these observations, Gonzalez thought that the officers were going to beat him.  He also believed that the officers would unnecessarily damage his mother's home while conducting their search if he did not talk and take them to the gun, crack, cash, and other items he had in a shoebox in his bedroom.  As a result, Gonzalez responded: "I ain't going to lie to

you.  I got some shit in here, but I'll give it up.  I don't want you busting up my mom's crib."

Gonzalez then took several officers to a basement bedroom that he identified as his.  There he showed them a shoebox containing a loaded gun, crack, a digital scale, a large amount of cash, Gonzalez's Massachusetts identification card, two plastic bags with cut corners, and two welfare cards and one credit card bearing the names of other individuals.

It is not proven that Gonzalez understood his <u>Miranda</u> rights or that he waived them voluntarily before taking the officers to his bedroom and showing them the shoebox.  Rather, the evidence indicates that he was coerced into cooperating with Smith and his colleagues at a time when he did not understand his rights.

After the officers located the shoebox, they asked Gonzalez if he had anything else to produce.  Gonzalez said he did not.  The officers then took Gonzalez and the shoebox containing the contraband upstairs to Smith, who was directing the search.

Smith told some of the other officers to do a further search. That search focused on what Gonzalez had identified as his bedroom. Three or four officers searched that room thoroughly.  The rest of the house was quickly searched, in what Smith characterized as a "cursory" manner.  After about five or ten minutes, the officers reported to Smith that a loaded handgun had been found under the mattress in Gonzalez's bedroom.  The officers gave the gun to

Smith.  No other contraband was found in the search of the house.

Smith repeatedly testified that Benitez remained with him in the living room at all times and, after a pat-frisk and warrant check, was allowed to leave. Benitez testified that, at Smith's direction, he was taken to an upstairs bedroom and strip searched. The evidence demonstrates that Benitez was indeed strip searched and that Smith's denial that this occurred was knowingly false.[2]

Smith knew that the official policy of the Fall River Police Department prohibited strip searches outside the police station except in an emergency.  However, he also knew, from personal experience, that officers in the Vice Unit, of which he had long been a member, routinely strip searched individuals they regarded as suspicious in the course of executing search warrants.[3]  While Smith testified that he could not recall participating in a strip search outside of the police station, this testimony was credibly contradicted by his fellow officers.[4]

---

[2]Smith's testimony concerning the search of Benitez is described in detail in §IV.D, infra.

[3]Cabral testified that the Vice Unit would "usually" strip search "the target of the warrant and anyone else" they found on the premises.  Nadeau testified that a "high percentage" of the strip searches he had performed occurred outside the police station, and that it was the regular practice of the Vice Unit to perform strip searches if they had good reason to look for drugs. Huard testified that it was standard for the Vice Unit to conduct strip searches in a home during the execution of a search warrant.  According to him, such strip searches were done often.

[4]Cabral testified that he "would have to say" that Smith participated in strip searches, because Smith was his partner and

As Huard and Martins, as well as Benitez testified, and as corroborated by Martins' written report, which was admitted as Exhibit 18,[5] Smith told Huard to take Benitez upstairs, where Smith

they would frequently perform strip searches while executing search warrants in houses when looking for drugs. However, Cabral said he could not remember any specific cases in which Smith engaged in a strip search. Nadeau testified that he was "sure there had been occasions" when he and Smith had conducted strip searches outside the station. Huard recalled at least one specific instance in which Smith had been present at a strip search outside the station.

[5]On May 4, 2010, the court scheduled the suppression hearing to begin on May 20, 2010, and continue as necessary. Also on May 4, 2010, the court issued a sequestration order that prohibited the witnesses from discussing this case. On May 5, 2010, it ordered that all material exculpatory information and all witness statements be produced to the defendant by May 12, 2010. See Fed. R. Crim. P. 26.2 and Rule 116.2(A)(2) of the Local Rules of the United States District Court for the District of Massachusetts.

In 2009, Fall River Police Department policy required the submission of a written report whenever a strip search was conducted. The prosecutor did not find or disclose Martins' report concerning the strip search before the suppression hearing began. She did, however, know from her interview with Martins that a strip search of Benitez had occurred. She also knew that Smith's report of Gonzalez's arrest, Exhibit 17, stated that Benitez was only pat-frisked in the living room, and the court infers that she knew that Smith would testify to this. Therefore, although the government did not intend to call Martins, the prosecutor knew that if Martins testified he would contradict Smith's testimony regarding the search of Benitez. Evidently recognizing that this contradiction constituted material impeaching information, the prosecutor told Gonzalez's counsel about it prior to the suppression hearing. See Giglio v. United States, 405 U.S. 150 (1972).

Gonzalez's counsel located Benitez shortly before the suppression hearing began. On May 20, 2010, Benitez testified that he was strip searched. Smith, who was sequestered, did not hear his testimony. Smith testified after Benitez, and on direct examination repeatedly asserted that Benitez was only pat-frisked

knew that, pursuant to standard practice, Benitez would be strip searched.[6]   After that strip search revealed no reason to detain Benitez further, he was allowed to leave.

After the search of his home was completed, Gonzalez was taken to the police station.   He was not taken the booking area, where events are videotaped.   Rather, his booking began in the Vice Unit office, where there is no videotaping.   Gonzalez was strip searched there.   Smith did not include the strip search of Gonzalez or Benitez in the report he wrote.

_____

in the living room.

Defense counsel asked the prosecutor to look for information regarding the Department's strip search policy as of February 2009.   Martins' report was found and disclosed to defense counsel that evening.   Pursuant to the May 5, 2010 Order and Giglio, supra, it should have been disclosed earlier.

On May 21, 2010, on cross-examination, Smith repeatedly testified that Benitez was not strip searched.   As described earlier, Benitez, Huard and Martin, as well as Martins' report, refute the accuracy and truthfulness of Smith's testimony concerning whether Benitez was strip searched.

[6]As discussed in §IV.D, infra, Smith's false testimony concerning whether Benitez was strip searched and whether Smith recalled ever participating in a strip search outside of the police station contribute to the court's conclusion that Smith's testimony that he did not punch Gonzalez is not credible and that Benitez is the more believable witness on the issue of whether Gonzalez was punched.   As also described infra, the punch is important to the court's conclusion that Gonzalez did not waive his Fifth Amendment rights knowingly and voluntarily.

IV.   ANALYSIS

   A.   Gonzalez's Fifth Amendment Rights Were Violated

   As described in §II.A supra, to defeat Gonzalez's motion to
suppress, the government must prove that (1) he understood his
Miranda rights and (2) he waived them knowingly and voluntarily.
See Moran, 475 U.S. at 421.  In this case, the government has not
done either.

   The government has not proven that Gonzalez understood his
Miranda rights on February 13, 2009.  He had just turned 20 years
old and had not finished high school.  He was neither well-educated
nor very intelligent.

   Gonzalez did have prior encounters with law enforcement.
However, these experiences do not demonstrate that he understood
his Miranda rights prior to February 13, 2009 or weigh heavily in
favor of such a finding.  Gonzalez had often been approached by
police conducting Field Checks.  "Such interactions...properly are
deemed consensual encounters because the individual approached
remains free to terminate the conversation at will." Narcisse, 457
Mass. at 6.  However, because they are consensual encounters,
officers need not inform those approached that they have a right to
remain silent.  Id. at 3. The Fall River police did not do so.  As
the Supreme Judicial Court recently found, such encounters often
involve not only questioning but pat-frisks.  Id. at 8.  See also
Jones, 609 F. Supp. 2d at 121 (Boston police officers "performed a

24

Field Intelligence Observation ("FIO").  More specifically, they obtained the identities of everyone in the group and pat-frisked the men.").  Where these frisks are not supported by the reasonable suspicion of both danger and criminal activity, they violate at least the law of Massachusetts.  <u>See</u> <u>Narcisse</u>, 457 Mass. at 6. Gonzalez always cooperated and answered the officers' questions when subject to a Field Check.  Therefore, the court infers that in the great majority of his interactions with the Fall River police Gonzalez was not informed of his right to remain silent, but rather was led to believe that he was generally expected to submit to questioning, and at times searches, when approached by police officers.

As an adult, Gonzalez had been arrested by the Fall River police twice before.  While he was administered <u>Miranda</u> warnings on these occasions, it has not been proven that he understood them. It has not been shown that the Fall River police follow common practices designed to assure and demonstrate that an arrested person understands his <u>Miranda</u> rights.  For example, in <u>Berghuis</u>, the Supreme Court found that there was ample evidence that the defendant understood his rights because he received a written copy of his <u>Miranda</u> rights, was given time to read them, and read one of them aloud.  2010 WL 2160784, at *11.  In some jurisdictions, individuals who have been arrested are required to sign a form acknowledging that they have been read, and understand, their

<u>Miranda</u> rights.   <u>See, e.g.</u>, <u>United States v. Beckles</u>, 565 F.3d 832, 836, 840 (11th Cir. 2009) (finding knowing, voluntary and intelligent waiver when defendant was read <u>Miranda</u>, initialed waiver form after each right was read to indicate his understanding, and signed the entire <u>Miranda</u> waiver form); <u>United States v. LeShore</u>, 543 F.3d 935, 938 (7th Cir. 2008) (suspect was given a form explaining his <u>Miranda</u> rights, read those rights aloud, then signed the waiver form); <u>United States v. Gibbs</u>, 237 Fed. App'x 550, 558-59 (11th Cir. 2007) (finding defendant's waiver knowing, intelligent and voluntary when defendant read his waiver-of-rights form aloud, stated he understood those rights, and signed a waiver); <u>United States v. Andrews</u>, 231 Fed. App'x 174, 176-77 (3d Cir. 2007) (finding defendant's statements voluntary when police read <u>Miranda</u> warnings and gave defendant a written copy, and defendant read portions of the warnings aloud and wrote his initials after each warning).   While none of these measures are constitutionally required, their absence means that the government in this case has not presented the type of evidence that has been relied upon by some courts in finding that defendants actually understood <u>Miranda</u> warnings that had been administered.

Moreover, the absence of such evidence is consistent with Smith's credible testimony that members of the Vice Unit preferred to execute search warrants when the suspects were present in part because they hoped to prompt them to make incriminating statements.

In this case at least, the <u>Miranda</u> warnings were given in a manner likely to minimize the risk that they would be understood and exercised. In addition, Gonzalez's wrist had been fractured in a previous arrest, in a hallway by about seven Fall River officers. The fact that he was injured in an altercation with the officers makes it less likely that he understood the <u>Miranda</u> warnings he was administered on that occasion.  <u>Cf.</u> <u>Brown</u>, 557 F.2d at 549.

In any event, it has not been shown that Gonzalez ever demonstrated his understanding of his <u>Miranda</u> rights by asking for an attorney or exercising his right to remain silent.

Moreover, the circumstances in which <u>Miranda</u> warnings were administered to Gonzalez in this case undercut the government's contention that he understood them.  The force necessary to subdue Gonzalez on the sidewalk may not have been objectively unreasonable as would be required if Gonzalez was moving to suppress based upon a violation of his Fourth Amendment rights.  <u>See</u> <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989); <u>Alexis v. McDonald's Restaurants of Massachusetts, Inc.</u>, 67 F.3d 341, 353 (1st Cir. 1995).  However, even if permissible, the force used to subdue a person may contribute to his inability to understand <u>Miranda</u> warnings and to the involuntariness of any statements he subsequently makes.  <u>See</u> <u>Brown</u>, 557 F.2d at 549; <u>Rullo</u>, 748 F. Supp. at 42.  In <u>Brown</u>, the suspect:

> was grabbed by the back of the neck, had his legs kicked
> out from under him, and was flung to the sidewalk where

he landed on his face.  Once on the sidewalk, between
three and four officers subdued the kicking and thrashing
suspect and handcuffed his hands behind his back.  During
the struggle, he was struck with a closed fist once and
"nudged" on the back of the head or neck with the butt of
a shotgun.

557 F.2d at 549.  In addressing the issue of whether subsequent
statements were made voluntarily, the Sixth Circuit wrote that,
"[t]he circumstances of the arrest and the amount of force employed
have relevance to determining [a suspect's] state of mind when he
made the incriminating statements a short time afterwards."  557
F.2d at 549.  This court finds that the circumstances of Gonzalez's
arrest and the force used to subdue him are relevant both to his
ability to comprehend the Miranda warnings he was given and to the
voluntariness of his subsequent statements.

    After a two minute struggle with three police officers, which
involved his being choked, Gonzalez was bleeding and dazed when
Smith quickly read him his Miranda warnings, right after he was
handcuffed.  It has not been proven that Gonzalez said that he
understood them.  In any event, "[m]erely asking the accused
whether he understood his rights does not satisfy the duties of an
interrogating officer or make any statement the accused might then
make admissible."  Porter, 764 F.2d at 7.  The government has not
proven that Gonzalez understood his Miranda rights the first time
Smith read them to him on the sidewalk.

    Nor has the government proven that Gonzalez understood his

28

<u>Miranda</u> rights when they were read to him a few minutes later. Gonzalez was still dazed and bleeding when he was taken into his house.   Smith's order that the door be closed because what was going to occur was nobody else's business caused Gonzalez to fear that Smith wanted privacy in order to keep civilian witnesses from seeing Smith harm him.   Gonzalez, with unwise bravado, made a sarcastic statement that provoked Smith to punch him in the stomach before putting him on the couch.   The <u>Miranda</u> warnings and search warrant were then quickly read to Gonzalez.

Once again, there is no claim that Gonzalez read the <u>Miranda</u> warnings himself, either silently or aloud, or signed anything stating that he understood them.   It is not proven that Gonzalez said he understood his rights.   In any event, it is not proven that he actually understood them.

Gonzalez did waive his right to remain silent in response to the request that he show the officers the contraband they were seeking.   However, it has not been shown that he did so "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."   <u>Moran</u>, 475 U.S. at 421; <u>see also</u> <u>Berghuis</u>, 2010 WL 2160784, at *10 ("The main purpose of <u>Miranda</u> is to ensure that an accused is advised of and understands his right to remain silent and his right to counsel.").

Nor was the waiver of Gonzalez's right to remain silent "voluntary in the sense that it was the product of a free and

deliberate  choice  rather  than  intimidation,  coercion,  or
deception."  Moran, 475 U.S. at 421; see also Porter, 764 F.2d at
7 ("Miranda requires the interrogating officer...to go further and
make  sure  that  the  accused,  knowing  his  rights,  voluntarily
relinquishes them.").

     The  fact  that  the  Miranda  warnings  administered  were
inadequate to cause Gonzalez to understand his Fifth Amendment
rights undermines the government's contention that his subsequent
statements  were  voluntary.   There  is  an  "interplay  between  the
Miranda and voluntariness analyses...."  Doody, 548 F.3d at 858.
"[W]hen  analyzing  the  voluntariness  of  a  confession  following
Miranda  warnings,  the  delivered  warnings,  even  if  sufficient  to
satisfy Miranda's prophylactic rule, must be examined in detail, as
they are part of the circumstances pertinent to the voluntariness
inquiry."  Id. at 860-61.  In Doody, the court found that "[t]he
Miranda  warnings  given  to  Doody  did  little  actually  to  inform
him...of the importance of his rights."  Id. at 862.  It also found
that  the  interrogating  officers'  words  and  actions  had  conveyed
"[t]he  clear  message...that  Doody  need  not  take  the  warnings
seriously and should waive his rights."  Id. at 863.  Ultimately,
the  court  concluded  that  "the  safety  net  that  proper,  serious
Miranda  warnings  provide – that  of  informing  a  suspect  of  his
rights and of the gravity of the situation – was quite weak [and]
prone to give way as a protection against an involuntary confession

if conditions were otherwise conducive to such a confession." <u>Id.</u> at 865-66; <u>see also</u> <u>Northern Mariana Islands v. Mendiola</u>, 976 F.2d 475, 485 (9th Cir. 1992) (holding that suspect's confession was involuntary in part because "<u>Miranda</u> rights were administered to [the suspect] in a manner that was confusing and affirmatively misleading"); <u>Cooper v. Dupnik</u>, 963 F.2d 1220, 1228 (9th Cir. 1992) (holding that statements were involuntary where officer's "psychological ploy was designed to make [the suspect] ignore the warnings, and begin to talk. [The officer] intended to undercut [the suspect's] Constitutional right not to talk...by complying with <u>Miranda</u>'s safeguards in form only, not in spirit or in substance.").

In this case, Smith and his fellow officers also acted in various ways that contribute to the conclusion that it has not been proven that Gonzalez's statements after being given <u>Miranda</u> warnings were voluntary.

"The manifest attitude of the police toward an accused is a relevant factor to consider in attempting to reconstruct the accused's state of mind. Any hostility shown by police at the time of arrest is relevant to the extent that it colors the accused's appreciation of the circumstances." <u>Brown</u>, 557 F.2d at 550 (citation omitted). Gonzalez was tackled and his face hit the sidewalk. He was then grabbed, kneed, and choked as eventually three officers struggled for two minutes to subdue him. He was

bleeding slightly and dazed by the time he was handcuffed.  While the amount of force used to gain control of Gonzalez may not have been unreasonable, it was clear to him that the officers would, if necessary, use force against him.  By punching Gonzalez, and telling him to "shut the fuck up," Smith communicated to him that force would also be used to punish him.  In Brown, the Sixth Circuit wrote that "[a]lthough a single blow would not necessarily require the suppression of a confession absent additional circumstances, the infliction of physical violence during an interrogation is a weighty factor to consider in determining whether a contemporaneous confession was voluntary."  Brown, 557 F.2d at 554 (citing Stein v. New York, 346 U.S. 156, 182-84 (1953)).  In this case, the court considers the fact that Gonzalez was punched shortly before he was given Miranda warnings and made incriminating statements to be just one of the totality of the related circumstances that defeat the contention that his statements were voluntary.

In Cooper v. Scroggy, 845 F.2d 1385, 1392 (6th Cir. 1988), the Sixth Circuit found that a single blow combined with the continuing presence of the striking officer created a coercive atmosphere that overbore a defendant's will. In the instant case, just before Gonzalez spoke, six officers were putting on gloves, probably in a routine and reasonable effort to minimize the risk of leaving or disturbing fingerprints on any contraband that was discovered.

32

However, because they did that while Gonzalez was bleeding and shortly after Smith punched him, Gonzalez believed that they were getting ready to beat him up.

Similarly, in other contexts a statement that a search will "tear the place apart" has been held not to constitute coercion that renders subsequent statements involuntary. See United States v. Wilkinson, 926 F.2d 22, 25 (1st Cir. 1991); see also United States v. Wilkerson, 76 Fed. App'x 657, 660 (6th Cir. 2003). However, in this case Smith had already punished Gonzalez by punching him. Gonzalez observed Smith holding his mother's television while Cabral asked Gonzalez to "show us where the stuff is so we don't have to go through this and start messing up everything in your house." Gonzalez concluded that his mother's home would be unnecessarily trashed in the search if he did not relent. This is another fact that contributes to the conclusion that the government has not proven that Gonzalez's incriminating statements were voluntary.

In essence, in view of the totality of the foregoing circumstances, the government has failed to prove that Gonzalez's statement that he would take the officers to the contraband they were seeking was either a knowing waiver of Miranda rights that he actually understood or voluntary. Therefore, suppression of both his statements and the physical evidence derived from them is required unless the inevitable discovery exception to the

exclusionary rule applies.  <u>See</u> <u>Chavez</u>, 538 U.S. at 769; <u>Patane</u>, 542 U.S. at 644.

D.  <u>The Inevitable Discovery Doctrine</u>

The inevitable discovery rule does not operate to prevent the suppression of the contents of the shoebox in this case.  As described earlier, in 1986, the First Circuit held in <u>Silvestri</u> that the government must prove that three essential concerns are satisfied in order for the inevitable discovery exception to the exclusionary rule to apply. <u>See</u> 787 F.2d at 744. The government must show that: (1) the legal means that could have been used to discover the evidence at issue were "truly independent" of the misconduct that makes it subject to suppression; (2) the discovery by that means was "truly inevitable," and (3) the application of the inevitable discovery exception would not "provide an incentive for police misconduct or significantly weaken [a constitutional] protection." <u>Id.</u> The First Circuit has repeatedly reaffirmed this formulation of the inevitable discovery test, most recently in 2006 in <u>Almeida</u>, 434 F.3d at 28.  <u>See also</u> <u>Scott</u>, 270 F.3d at 45; <u>Pardue</u>, 385 F.3d at 108; <u>United States v. Ford</u>, 22 F.3d 374, 380 (1st Cir. 1994).

The Sixth Circuit has criticized use of the third prong of the First Circuit's test, the requirement that application of the inevitable discovery exception not provide an incentive for police misconduct or significantly weaken constitutional protections.  <u>See</u>

34

United States v. Alexander, 540 F.3d 494, 503-04 (6th Cir. 2008);
but see United States v. Haddix, 239 F.3d 766, 768 (6th Cir. 2000)
(holding that argument that officers had probable cause and could
have obtained a warrant and inevitably discovered marijuana "is
untenable" because government's position would "completely obviate
the warrant requirement.") (internal quotation marks omitted).

As the First Circuit's formulation of the inevitable discovery
exception recognizes, "[t]he core rationale consistently advanced
by [the Supreme] Court for extending the exclusionary rule to
evidence that is the fruit of unlawful police conduct has been that
this admittedly drastic and socially costly course is needed to
deter police from violations of constitutional and statutory
protections." Nix, 467 U.S. at 442-43. See also Brown v.
Illinois, 422 U.S. 590, 599-600 (1975) (the exclusionary rule is
judicially crafted "to prevent, not to repair. Its purpose is to
deter – to compel respect for the constitutional guaranty in the
only effectively available way – by removing the incentive to
disregard it.") (internal quotation marks omitted). As described
earlier, even a deliberate failure to provide Miranda warnings will
not result in the suppression of physical evidence derived from
incriminating statements subsequently made voluntarily. See
Patane, 542 U.S. at 642. However, when incriminating statements
are not made knowingly, and also are not made voluntarily, any
physical evidence derived from them is inadmissible because the

Supreme Court has "repeatedly explained 'that those subjected to coercive police interrogations have an <u>automatic</u> protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial.'"  <u>Id.</u> at 640 (quoting <u>Chavez</u>, 538 U.S. at 769) (emphasis in original).  In the instant case, the First Circuit's requirement that the inevitable discovery exception not be applied if it would provide an incentive for police misconduct in the form of coercion, or would significantly weaken the Fifth Amendment protections against punitive use of physical force by police officers, is consistent with the Supreme Court's reasoning in <u>Nix</u>, <u>Patane</u>, and <u>Chavez</u>.

In any event, it is axiomatic that "[u]ntil a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority." <u>Eulitt ex rel. Eulitt v. Maine, Dept. of Educ.</u>, 386 F.3d 344, 349 (1st Cir. 2004). As described earlier, the First Circuit has been clear and consistent in requiring that courts decide whether application of the inevitable discovery exception would weaken constitutional protection or abet police misconduct. <u>See</u> <u>Almeida</u>, 434 F.3d at 28; <u>Scott</u>, 270 F.3d at 45; <u>Pardue</u>, 385 F.3d at 108; <u>Ford</u>, 22 F.3d at 380; <u>Silvestri</u>, 787 F.3d at 744.  Therefore, this court is following First Circuit precedent.

In this case, the search warrant for Gonzalez's home was

36

obtained before any police misconduct occurred.  Therefore, it was truly independent of that misconduct.  The warrant authorized a search for drugs, particularly crack, related paraphernalia, personal papers, and money.  The shoebox containing such items was in plain view in the basement bedroom used by Gonzalez.  It is likely that it would have been discovered and opened in the course of a proper search.  Therefore, the contents of the shoebox would have been inevitably discovered.

However, permitting the contents of the shoebox to be used as evidence in this case would significantly weaken Fifth Amendment protections against self-incrimination and coercion.  In 1990, in Rullo, this court dealt with one of the first cases to arise from the operation of a then new Boston Drug Task Force.  See 748 F. Supp. at 45.  Boston police officers beat a suspect they believed had shot at them, coerced him into telling them where he had thrown the gun, and then testified falsely about what they had done.  Id. at 38-40, 45.  Although the gun would have been found without the police misconduct, this court found the inevitable discovery exception to be inapplicable for reasons that are also compelling in the instant case.

This court has only recently begun seeing cases arising from the work of Fall River police officers.  It is foreseeable that Fall River, and other, law enforcement officers will again in the future encounter young men who may resist being stopped and insult

37

them as they prepare to execute search warrants.  Application of
the inevitable discovery doctrine in this case would encourage law
enforcement officers to believe that they can punitively punch
insolent individuals and "avoid the burden of a prolonged []
search" by intimidating and coercing them into making incriminating
statements "without significant risk of forfeiting the
admissibility of any physical evidence." Id. at 44.  Therefore, the
court finds that "this is the type of case in which the
exclusionary rule has a substantial potential deterrent effect
which would be significantly weakened if the inevitable discovery
rule was applied."  Id.  (citing In re Motion for Return of
Property Pursuant to Rule 41, Federal Rules of Criminal Procedure,
681 F. Supp. 677, 687 (D. Hawaii 1988), aff'd sub nom. Center Art
Galleries-Hawaii, Inc. v. United States, 875 F.2d 747, 754-55 (9th
Cir. 1989)).

Applying the inevitable discovery exception to the
circumstances of this case would also abet police misconduct
independent of a weakening of the protections provided by the Fifth
Amendment.  In this case, Benitez was strip searched in
circumstances that may well have violated his Fourth Amendment
right to be free from unreasonable searches and seizure.  Smith
deliberately testified falsely that Benitez had not been strip
searched and, indeed, that he could not recall ever participating
in a strip search outside the police station.  Smith told the

38

court, "I did not - nor did any detective - strip search Mr. Benitez. We just checked his pockets, sir, we never had him remove any clothing.... He was fully clothed, his pockets were checked, he was checked for any drugs or contraband... but at no time was he ever asked to remove something as simple as a T-shirt, your Honor." On the second day of testimony, Smith told the court that this search had been conducted in the living room, and that Benitez had been allowed to leave after his warrant check came back clear. Later that same day, Smith reiterated this assertion, describing Benitez's search as "a quick cursory search of his pockets" and a check for warrants in Gonzalez's living room.

When asked if he had ever participated in a strip search outside the police station, Smith responded, "I cannot recall at this time.  I would say that they're mainly at the police department building itself...." He explained that the department policies regarding strip searches exist because "[w]e take it very seriously to protect someone's dignity or privacy."

This testimony was important to the case against Gonzalez. Benitez had testified both to being strip searched and to seeing Smith punch Gonzalez before administering <u>Miranda</u> warnings in the house.  The fact that it has been convincingly shown that Smith lied about the strip search has contributed to the court's conclusion that Smith's denial that he punched Gonzalez is not credible and that Benitez's testimony on this issue too was

reliable.  This case, in which Gonzalez faces a 15-year mandatory minimum sentence if convicted, is important to the defendant and to the public.  Smith's false testimony threatened the court's ability to decide properly whether important evidence would be admissible at any trial.

Twenty years ago, in <u>Rullo</u>, this court wrote that "[i]t is essential that the state and local law enforcement officials now increasingly likely to appear in United States district courts understand that misconduct generally, and fabricating testimony specifically, is not only wrong, but may jeopardize the important cases they have bravely taken personal risks to investigate and wish to prosecute successfully." <u>Id.</u> at 45.  One year ago, this warning was expressly reiterated in another case involving false testimony by a Boston police officer, and by two Massachusetts State Troopers as well.  <u>See</u> <u>United States v. Jones</u>, 620 F. Supp. 2d at 165-66 & n.1 (citing <u>Jones</u>, 609 F. Supp. 2d at 122-23 & n.6).[7]  Those warnings were not sufficient to deter the misconduct,

---

[7] The findings that the Boston police officer testified falsely were highly publicized over several months.  <u>See, e.g.</u>, Jessica Fargen and Peter Gelzinis, <u>Thin Blue Lie</u>, Boston Herald, Sept. 27, 2009, News at 5 ("In May, a federal judge concluded that [a] Boston cop [] falsely testified in a gun case."); Jonathan Saltzman, <u>Judge Chastises Federal Attorney Says Prosecutor Failed to Disclose Crucial Evidence</u>, Boston Globe, Jan. 27, 2009, B1 ("Chief [] Judge Mark L. Wolf said in a sharply worded memorandum that [the prosecutor] failed to disclose that a Boston police officer's testimony at a pretrial hearing contradicted what the officer had repeatedly told the prosecutor beforehand.... The truth, Wolf said, only came out during the pretrial hearing...."); Jonathan Saltzman, <u>US Prosecutor Admits</u>

including false testimony, by Smith in this case. The court has considered "the societal costs of the exclusionary rule" in deciding whether or not to find the inevitable discovery exception applicable in the instant case. See Scott, 270 F.3d at 45; Pardue, 385 F.3d at 108. At this time, it is not clear whether suppression of the contents of the shoebox will ultimately permit Gonzalez, who has been detained for a year pending trial, to escape conviction in this case. As described in §IV.E, infra, the second gun found in his bedroom may prove to be admissible against him.

In any event, the cost to society of releasing Gonzalez, if necessary, is outweighed by the cost of not sanctioning Smith's misconduct.[8]  There is the risk that despite the ordeal that this

_____

Error, Hopes for 2d Chance, Boston Globe, May 13, 2009, Metro at 4 ("[The officer] testified at a key pretrial hearing in October that he made eye contact with a man on a bicycle and that the man turned and rode away.... This was suspicious, [he] said, because he recognized him as Darwin E. Jones and had never known Jones to avoid him.... However, the report that [the officer] wrote immediately after the arrest said nothing about him recognizing Jones on the bicycle...."); Jonathan Saltzman, Judge Delays a Decision on Sanctions; Prosecutor is Reprimanded, Boston Globe, May 19, 2009, Metro at 2 ("Wolf discovered the inconsistencies at the hearing after reviewing [the prosecutor's] notes of her interviews with the officer [], who the judge concluded lied on the stand."); Dick Lehr, A New 'Bright Line Rule' Against Lying, Boston Globe, July 31, 2009, Opinion at 15 ("[J]udge Mark Wolf [] kicked off a legal brouhaha this spring by ruling that an arresting officer in a Boston gun case had testified falsely.").

[8]The court recognizes that deliberately testifying falsely that a material fact is not remembered constitutes perjury.  See United States v. Collatos, 798 F.2d 18, 19 (1st Cir. 1986). However, law enforcement officers are rarely, if ever, prosecuted for perjury.  The court finds that neither the theoretical threat of being prosecuted for perjury nor the possibility of a civil

case has constituted, Gonzalez will be among the many young men who sell crack in Fall River.   There is also the risk that he will engage in violent crimes.   However, if Smith's misconduct in punching Gonzalez and testifying falsely is, as a practical matter, condoned by the court, the security and liberty of all in this nation will be eroded.   For, as Justice Louis D. Brandeis explained:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen.   In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example.   Crime is contagious.   If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.   To declare that in the administration of the criminal law the end justifies the means-to declare that the government may commit crimes in order to secure the conviction of a private criminal-would bring terrible retribution.

Olmstead, 277 U.S. at 485 (Brandeis, J., dissenting).

In view of the foregoing, the inevitable discovery exception to the exclusionary rule does not apply to the contents of the shoebox.

E.   The Second Gun

It is not now clear whether the second gun found in the search of Gonzalez's home should be suppressed.   As explained earlier,

---

suit is sufficient to deter false testimony by law enforcement officers.

Gonzalez led the officers to the shoebox containing a gun, crack, and other evidence.  He did not, however, tell the officers about the second gun that was later found under his mattress.  Rather, after Gonzalez took several officers to the bedroom he identified as his, and showed them the shoebox, that bedroom was the focus of a thorough search, by three or four officers, who found the second gun under the mattress.  The rest of the house was searched quickly, in a cursory manner.  These facts raise the question of whether the second gun is evidence that was derived from the violation of Gonzalez's Fifth Amendment rights.  The second gun presents discrete issues that the parties have not addressed.  They are now being afforded an opportunity to do so in the context of the following jurisprudence.

When, as here, the defendant has proven a violation of a constitutional right that requires the suppression of evidence derived from that violation:

> The defendant then bears the burden of demonstrating "a factual nexus between the illegality and the challenged evidence." United States v. Kandik, 633 F.2d 1334, 1335 (9th Cir. 1980).  Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not "fruit of the poisonous tree," either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct.  See id. (placing this burden of proof on the government); United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982) (recognizing the inevitable discovery, independent means, and attenuation doctrines).

United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir.

2000).

In Brown, 422 U.S. at 599, the Supreme Court analyzed whether the taint of an illegal arrest had been sufficiently diminished to permit the use of a voluntary confession after Miranda warnings had been given.  The Supreme Court considered whether the causal link between the arrest and confession had been broken, by focusing on three factors: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct."  Id. at 603-04 (internal citation omitted).  As Judge Douglas P. Woodlock has rightly written:

> Deployment of the Brown factors has not been limited to confessions but has become the test of whether legally obtained evidence gained as a result of prior illegal police conduct is sufficiently attenuated from the underlying illegality in all exclusionary rule contexts. See United States v. Pimental, 645 F.2d 85, 86 (1st Cir. 1981) (applying Brown factors to connection between photo of car and illegal detention); United States v. Thompson, 35 F.3d 100, 105 (2d Cir. 1994) (applying Brown to statements made a month after illegal detention); United States v. Seidman, 156 F.3d 542, 548-49 (4th Cir. 1998) (involving consent to tape record conversation following illegal entry); United States v. Melendez-Garcia, 28 F.3d 1046 (10th Cir. 1994) (applying Brown factors to determine whether consent to search was tainted by illegal arrest); U.S. v. Pena, 924 F. Supp. 1239, 1251 (D. Mass. 1996) (consensual search tainted by earlier unconstitutional sweep); State v. Hight, 781 A.2d 11 (N.H. 2001) (applying Brown factors to consent to search following illegal motor vehicle stop).

United States v. Goodrich, 183 F. Supp. 2d 135, 146 (D. Mass. 2001).

As indicated earlier, courts have considered the inevitable

discovery and independent source exceptions to the exclusionary rule, as well as the issue of attenuation, in some cases.  See Nava-Ramirez, 216 F.3d at 1131.  As described previously, the test for satisfying the inevitable discovery doctrine has not been met in this case.  "As the Supreme Court pointed out in Nix, the 'independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation.'"  Silvestri, 787 F.2d at 739 (quoting Nix, 467 U.S. at 443) (emphasis added).  Therefore, it now appears to this court that its decision on the attenuation issue concerning the second gun will also resolve the independent source question.

It is necessary that the parties address whether the violation of Gonzalez's constitutional rights that the court has found requires the suppression of the second gun.

V.   CONCLUSION

For the foregoing reasons, Gonzalez's Motion to Suppress (Docket No. 42) is meritorious, at least with regard to his statements and the contents of the shoebox.  To that extent, it is hereby ALLOWED.

It is uncertain whether the Motion to Suppress is also meritorious with regard to the second gun which was found under Gonzalez's mattress.  Therefore, it is hereby ORDERED that:

1.   Counsel shall confer and, by July 14, 2010, inform the

court whether they have reached an agreement to resolve this case.

2.    If not, the parties shall, by July 26, 2010, file memoranda addressing whether or not the second gun should be suppressed.

3.    Any replies shall be filed by August 2, 2010.

4.    If there is not an agreement that resolves this case, the court will hear argument, but not additional evidence, concerning the request to suppress the second gun on August 11, 2010, at 3:00 p.m.

5.    As a further hearing on the Motion to Suppress is necessary, the time to August 11, 2010, is EXCLUDED for Speedy Trial purposes.  <u>See</u> 18 U.S.C. §3161(h)(1)(D).

      <u>/s/  Mark  L.  Wolf</u>
UNITED STATES DISTRICT JUDGE